**In re Luis RIVERA, Debtor.**

**Pedro RAMOS & Zoila Ramos,
Co–Trustees, Plaintiffs,**

**v.**

**Luis RIVERA, Defendant.**

**Bankruptcy No. 93–52142.
Adversary No. 93–5230.**

United States Bankruptcy Court,
D. Connecticut.

Feb. 2, 1998.

Melissa A. Buckley, Buckley & Buckley, New Haven, CT, for plaintiffs.

Walter D. Wagoner, Jr., New Haven, CT, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

ALBERT S. DABROWSKI, Bankruptcy Judge.

## I. INTRODUCTION

This adversary proceeding presents a disturbing factual scenario which raises intriguing legal and ethical questions. However, most of those issues are not necessary to the disposition of this proceeding. This Court need only determine the relatively narrow issue of whether the debt of the Debtor–Defendant to the Plaintiffs is dischargeable in his bankruptcy case—a determination which turns ultimately on an assessment of the Debtor–Defendant's state of mind.

## II. JURISDICTION

The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(1).

## III. PROCEDURAL HISTORY

This bankruptcy case was commenced through the Debtor–Defendant's filing of a voluntary petition, and this Court's simultaneous order for relief, under Chapter 7 of the United States Bankruptcy Code on June 25, 1993 (hereafter referred to as the "Petition Date"). Thereafter, the Plaintiffs instituted this adversary proceeding through the filing of a Complaint (hereafter referred to as the "Complaint") [1] seeking a determination and declaration of the dischargeability of a debt arising from a mortgage note. The proceeding was tried before this Court on December 13 and 14, 1994 and January 6, 1995.

1. The initial Complaint was filed on October 4, 1993. It was first amended by Complaint dated

## IV. FINDINGS OF FACT

1. In May 1985, and prior thereto, the Defendant was, *inter alia*, a real estate investor. In the documentation of the Defendant's various real estate transactions, several forms and spellings of his name were utilized, to wit: "Luis Rivera", "Luis A. Rivera", "Luis E. Rivera", "Louis Rivera", "Luis Riveria".

2. The Defendant had a close business relationship with one Arthur Lewis (hereafter referred to as "Lewis"), who was a mortgage lender, a mortgage broker, a real estate broker and a "mortgage consultant". Lewis often advised the Defendant on real estate matters, and frequently became involved as a participant in the Defendant's real estate transactions. Specifically, Lewis (i) brokered purchases and sales of properties for the Defendant, (ii) brokered mortgages for the Defendant and (iii) provided direct mortgage financing for the Defendant. At no time relevant to this proceeding was the Defendant a partner of Lewis'.

3. For over 25 years attorney Murray Trachten (hereafter referred to as "Trachten") has provided legal representation for Lewis. On occasion, Trachten has also represented the Defendant, most often while also representing Lewis in transactions between Lewis and the Defendant. At no time relevant to this proceeding was the Defendant a partner of Trachten's.

4. In May 1985, the Plaintiffs were the owners of an improved parcel of real property known as and numbered 485–7 Howard Avenue, New Haven, Connecticut (hereafter referred to as the "Howard Property"), together with a restaurant business located thereon.

5. The Defendant had been a patron at the Plaintiffs' restaurant, and approached them to inquire about purchasing the Howard Property and the restaurant business. The Plaintiffs did not know the Defendant outside of his patronage of their restaurant.

6. On May 28, 1985, the parties executed a written contract (hereafter referred to as the "Contract") for the purchase and sale of

November 14, 1994, and amended further by Complaint dated December 6, 1994.

the Howard Property on the following terms, *inter alia:* the Plaintiffs would sell the Howard Property to Defendant for $175,000.00, $45,000.00 of which would be represented by a promissory note from the Defendant in favor of the Plaintiffs (hereafter referred to as the "Promissory Note"), which was to be secured by a "Purchase Money Second Mortgage" (hereafter referred to as the "Plaintiffs' Mortgage").

7. In the Contract the Defendant's name took the form, "Luis Riveria". The Contract was prepared by Edward Botwick, the attorney for the Plaintiffs.

8. Subsequent to their execution of the Contract, the parties agreed that the Plaintiffs' Mortgage should not encumber the Howard Property, but instead would be placed against another of the Defendant's real properties known as and numbered 113–119 Putnam Avenue, New Haven, Connecticut (hereafter referred to as the "Putnam Property").

9. At the closing on the Contract, the Plaintiffs purportedly conveyed the Howard Property to the Defendant by a warranty deed (hereafter referred to as the "Warranty Deed")—a document prepared by Attorney Botwick. The name of the grantee in the Warranty Deed is "Luis Riveria". At the same time, the Defendant executed the Promissory Note and the accompanying Plaintiffs' Mortgage. The Plaintiffs' Mortgage was also prepared by Attorney Botwick and denominated the grantor as "Luis Riveria".

10. Aside from executing the documents prepared by Attorney Botwick, the Defendant has never represented himself to be "Luis Riveria".

11. The Warranty Deed and Plaintiffs' Mortgage were recorded on the New Haven, Connecticut Land Records on September 12, 1985.

12. The Promissory Note provided, *inter alia,* for annual interest-only payments of $4,500.00 for the first seven years beginning September 11, 1986, followed by a single and final "balloon" payment. The Defendant made the first annual payment and $2,000.00 of the second annual payment. Thereafter,

the Defendant made no more payments. The Defendant does not dispute his indebtedness to the Plaintiffs under the Promissory Note.

13. Subsequent to his granting of the Plaintiffs' Mortgage, the Defendant granted Lewis a series of mortgage interests in the Putnam Property, the last of which was a "blanket" mortgage purportedly securing a debt from the Defendant to Lewis in the original principal amount of $88,000.00 (hereafter referred to as the "Blanket Mortgage").

14. In June of 1988, the Defendant conveyed the Putnam Property by warranty deed to an entity known as Secondary Mortgage Investment, Inc. (hereafter referred to as "SMI") for a stated purchase price of $150,000.00 (hereafter referred to as the "Putnam Sale"). SMI's principals were a Mr. Lucibello and a Mr. Vignola.

15. The Putnam Sale was brokered by Lewis and closed by Trachten.

16. Lewis agreed to provide financing to SMI in the gross amount of $67,000.00. That financing was to be secured by a mortgage on the Putnam Property (hereafter referred to as the "SMI Mortgage").

17. At the time of the Putnam Sale, the Plaintiffs allege that the Putnam Property was encumbered by the following mortgages, in order of priority: (i) a mortgage to First Federal Bank (hereafter referred to as the "First Federal Mortgage"), (ii) the Plaintiffs' Mortgage, and (iii) the Blanket Mortgage.

18. At all times relevant hereto, Lewis and Trachten were aware of the existence of the Plaintiffs' Mortgage.

19. From his numerous real estate dealings the Defendant had formed a belief that mortgages had to be paid off or assumed upon the sale of a given property. Before the Putnam Sale, the Defendant approached Trachten, asking what was going to happen to the Plaintiffs' Mortgage. Trachten told the Defendant to see Mr. Lewis. The Defendant then met with Lewis and asked him the same question. Lewis told the Defendant "not to worry" about the Plaintiffs' Mortgage—that Lewis and Trachten would "take care of it". The Defendant did not know

precisely how Trachten and Lewis intended to deal with the Plaintiffs' Mortgage or other particulars regarding the proposed sale, but trusted and relied upon the advice and statements of Trachten and Lewis, much as he had in connection with previous real estate transactions.

20. The Putnam Property was sold to SMI subject to the First Federal Mortgage and Blanket Mortgage. Those mortgages are scheduled as "assumptions"[2] on the Putnam Sale Closing Statement (hereafter referred to as the "Closing Statement"), and, according to the Closing Statement, provided $ 51,522.80 and $ 88,000.00, respectively, of SMI's purchase price consideration.[3]

21. The Plaintiffs were not informed of the Putnam Sale, and they received no proceeds therefrom. The Plaintiffs' Mortgage was not scheduled on the Closing Statement.

22. The Closing Statement reveals that in connection with the Putnam Sale: (i) Lewis received $6,500.00 as a "Commitment Fee", (ii) Trachten received $1,025.00 in attorney's fees, (iii) SMI received fee simple title to the Putnam Property and $50,090.02 in cash, and (iv) the Defendant received $6,155.79 in cash.

23. The Plaintiffs allege that the Putnam Sale left the Putnam Property encumbered by the following mortgages: (1) the First Federal Mortgage, (2) the Plaintiffs' Mortgage, (3) Lewis' Blanket Mortgage, and (4) the SMI Mortgage.

24. Subsequent to the Putnam Sale, SMI quit-claimed the Putnam Property to an entity known as NollaBello, Inc. The principals of NollaBello, Inc., as with SMI, were Mr. Lucibello and Mr. Vignola.

25. In April 1990, the Plaintiffs' commenced an action in the Connecticut Superior Court to foreclose their mortgage interest in the Putnam Property.

26. In October, 1990, NollaBello, Inc. conveyed the Putnam Property to an individual who is unrelated to the Defendant.

27. Within the Plaintiffs' foreclosure action on the Putnam Property various defendants, including Lewis, have defended on the legal theory that the Plaintiffs' Mortgage is not in the "chain of title" because the Defendant's name in the Plaintiffs' Mortgage is spelled "Riveria" rather than "Rivera".

## V. CONCLUSIONS OF LAW

A bankruptcy discharge has the following effects, *inter alia:*

(1) [it] voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727 ... of ... title [11] ... [and]

(2) [it] operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor....

11 U.S.C. § 524(a) (1993)

A debtor in a Chapter 7 case receives a discharge of debts under the authority of Section 727(b) of the Bankruptcy Code, which provides, in relevant part, that *"[e]xcept as provided in section 523 of this title, a discharge ... discharges the debtor from all debts that arose before the date of the order for relief under this chapter...."* (emphasis supplied).

The second amended version of the Plaintiffs' Complaint seeks to determine the dischargeability of a debt under the standards of Bankruptcy Code Section 523(a)(2), (4) and (6). These subsections provide in pertinent part as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services or an extension ... of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a

---

**2.** SMI did not formally assume the Blanket Mortgage or First Federal Mortgage obligations.

**3.** The Closing Statement and the Defendant's warranty deed to SMI appear to refer to the First Federal Mortgage erroneously as a mortgage to "First constitution Bank".

statement respecting the debtor's or an insider's financial condition:

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive

\* \* \* \* \* \*

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny

\* \* \* \* \* \*

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity

\* \* \* \* \* \*

11 U.S.C § 523(a) (1993).

■ In view of the "fresh start" policy of the Bankruptcy Code, exceptions to the dischargeability of debts should be narrowly construed in favor of the debtor. *In re Bonnanzio*, 91 F.3d 296, 300 (2d Cir.1996). The party opposing the bankruptcy discharge of a particular debt bears the burden of proving by a preponderance of the evidence that the requirements of the relevant subsection of Section 523(a) have been met. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Thirtyacre*, 36 F.3d 697 (7th Cir.1994).

## A. Analysis of Section 523(a)(2).

The Plaintiffs' allegations under Section 523(a)(2) relate to the Defendant's execution of documents that contained a misspelling of the Defendant's last name, namely "Riveria" rather than "Rivera".

The Court notes initially that subsection (B) of Section 523(a)(2) is inapplicable to the present adversary proceeding because the Plaintiffs' do not allege any misrepresenta-

tion regarding the debtor's or an insider's "financial condition". *Cf., Field v. Mans*, 516 U.S. 59, 65–66, 116 S.Ct. 437, 441, 133 L.Ed.2d 351 (1995) (discussing relationship of subsections (a)(2)(A) and (B)). Thus, this Court focuses solely upon the requirements of subsection (A) of Section 523(a)(2).

The elements of a Section 523(a)(2)(A) cause of action are consistently enumerated as follows:

1. the debtor made a false representation;

2. at the time of the representation, the debtor knew the representation to be false;

3. the debtor made the representation with the intention and purpose of deceiving the creditor or inducing the creditor to act to its detriment;

4. the creditor justifiably relied on the representation to its detriment; and

5. the representation was the proximate cause of the creditor's loss.

*See, e.g., In re Roberti*, 183 B.R. 991, 1005 (Bankr.D.Conn.1995); *cf., Field v. Mans*, 516 U.S. at 68–70, 116 S.Ct. at 443.

■ The answer to the initial question— whether the *Defendant* made a false representation—is far from clear. Critically, the scrivener of the allegedly false representation—a misspelled name—was the Plaintiffs' attorney, Mr. Botwick. At best, the Defendant tacitly and passively affirmed Attorney Botwick's representation, assuming he noticed the misspelling at all.[4]

Even assuming the Plaintiffs have established that the Defendant made a conscious misrepresentation regarding the spelling of his last name in the Plaintiffs' Mortgage, among other documents, they have wholly failed to prove that the Defendant made such a representation with the intention or purpose of deceiving the Plaintiffs, or inducing them to act to their detriment. There was absolutely no evidence presented to support a conclusion that the Defendant observed the error and seized upon it in an effort to defraud the Plaintiffs.

---

4. Ironically, the Plaintiffs also made tacit or passive misrepresentations in the subject documentation. Plaintiff Zoila Ramos signed the Warran-

ty Deed which referred to her as "Zolia" Rosa Ramos. In addition, the Plaintiffs' Mortgage refers to a "Zolia" Ramos as grantee.

## B. Analysis of Section 523(a)(4).

The Plaintiffs also assert that the Defendant's conduct with respect to the Putnam Sale renders their mortgage debt non-dischargeable under the terms of Section 523(a)(4). Specifically, they seem to argue that their Mortgage had to be released or paid off at the time of the Putnam Sale, and that the Defendant's failure to pay the proceeds of sale to them constitutes "larceny", "embezzlement", and/or "fraud or defalcation in a fiduciary capacity".

Section 523(a)(4) embraces three separate types of conduct: "larceny", "embezzlement", and "fraud or defalcation in a fiduciary capacity". Each type of conduct is to be defined and determined under federal law. *See, e.g., Fowler Brothers v. Young (In re Young),* 91 F.3d 1367, 1371 (10th Cir.1996); *Chemical Bank v. Marcou (In re Marcou),* 209 B.R. 287, 293 (Bankr.E.D.N.Y.1997).

For purposes of Section 523(a)(4), federal common law defines "larceny" as the "fraudulent and wrongful taking and carrying away [of] the property of another with intent to convert such property to the taker's use without the consent of the owner." *E.g., In re Balzano,* 127 B.R. 524, 532 (Bankr. E.D.N.Y.1991). Here, the Defendant did not commit larceny because, *inter alia,* as a matter of law (i) the Plaintiffs' mortgage interest, if any, in the Putnam Property was left unaffected by the Putnam Sale, and therefore, not "converted;" and (ii) the cash proceeds of the Putnam Sale were not the Plaintiffs' property. In addition, this Court finds as a factual matter that the Defendant did not act with fraudulent intent in connection with the Putnam Sale.

"Embezzlement", for the purposes of Section 523(a)(4), is defined by federal common law as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *E.g., Hartford Police F.C.U. v. DeMaio (In re DeMaio),* 159 B.R. 383, 384 (Bankr.D.Conn.1993) (quoting 3 *Collier on Bankruptcy,* ¶ 523.14[3] at 523–113 (15th ed.1992)). For the reasons stated in the preceding paragraph with respect to "larceny", the Defendant has not committed "embezzlement" within the meaning of Section 523(a)(4) with respect to the Plaintiffs.[5]

The "fiduciary relationship" contemplated by Section 523(a)(4) is one springing from an "express or technical trust". *E.g., Young, supra.* The Plaintiffs have neither produced documentation [6], nor cited to statutory or other legal authority, creating an express or technical trust under which the Defendant was trustee and they were beneficiaries. The Court is aware of no authority creating a trust relationship under the facts of this case, *i.e.* authority deeming a seller of real estate a trustee for the benefit of mortgagees.

Even assuming that an express or technical trust relationship existed between the parties in connection with the Putnam Sale, this Court finds and concludes that the Defendant committed no "fraud" or "defalcation" in connection therewith. The Defendant acted with no fraudulent intent in any transaction relevant to this proceeding; and to the extent that "defalcation" contemplates reckless, or even negligent conduct, the Defendant is absolved because he inquired of, and placed reasonable reliance on his profes-

---

5. The Plaintiffs argue that in a "title theory" state such as Connecticut, their Mortgage constituted a fee simple interest in the Putnam Property. Consequently, they assert, the Defendant's sale of the Putnam Property to SMI constitutes an "embezzlement" of that fee simple interest. However, the Plaintiffs ignore the legal fact that the Defendant could only convey *his* interest in the Putnam Property. He could not, and did not, convey *their* interest, if any. Thus, if the Plaintiffs indeed held a fee simple interest prior to the Putnam Sale, they held that same interest after the sale. The Defendant could not have illicitly appropriated their interest by selling his interest.

6. The Plaintiffs' Mortgage does not even *require* payment of the secured debt upon sale of the mortgaged property. That document states "that if all or any part of the Premises [Putnam Property] or an interest therein is sold or transferred by Grantor [Defendant], without written permission of the Grantee [Plaintiffs], whether said interest is equitable or legal, Grantee *may, at his sole option,* declare all sums due hereunder due and payable immediately forthwith." (emphasis supplied). In the time period relevant to this proceeding, the Plaintiffs did not opt to declare the Promissory Note due and payable.

sionals, Lewis and Trachten, respecting the treatment of the Plaintiffs' Mortgage at the Putnam Sale.

## C. Analysis of Section 523(a)(6).

■ The Plaintiffs assert that the Defendant's conduct with respect to the Putnam Sale renders their mortgage debt non-dischargeable under the terms of Section 523(a)(6).

Bankruptcy Code Section 523(a)(6) excepts from a debtor's discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity". "Willful" conduct is not defined by the Bankruptcy Code, but is generally held to contemplate a "deliberate or intentional" action. *E.g., Navistar Financial Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir.1996). The term "malicious"—also not defined by the Bankruptcy Code—means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will". *Id.*[7]

This Court finds and concludes that the evidence presented in this proceeding fails to establish any "willful and malicious" conduct by the Defendant as against the Plaintiffs and/or their property.[8]

## D. Imputed Non–Dischargeability.

■ In the preceding subsections of these Conclusions of Law, the Court has determined that in no respect did the Defendant act with the requisite level of scienter to establish the non-dischargeability of a debt under Sections 523(a)(2), (4) or (6). In so concluding, however, this Court does not necessarily disagree with the Plaintiffs' view that they were preyed upon in the treatment of their mortgage interest in the Putnam Property. Indeed, based upon the record before this Court, it appears that *both* the

Plaintiffs *and the Defendant* were victims of the predacious conduct of, and were possibly defrauded by, Lewis and/or Trachten.

Nonetheless, the Plaintiffs invite this Court to impute to the Defendant the presumed illicit conduct and intent of Lewis and/or Trachten. They allege an agency relationship in which the Defendant, as principal, is responsible for, and has imputed to him, the conduct and *mens rea* of his real estate agent—Lewis—and/or his attorney—Trachten. Assuming, without deciding, that an agency relationship existed between the Defendant and Lewis and/or Trachten, this Court must decline to follow the Plaintiffs' urging for at least two reasons. First, although the presentation of evidence in this Court has aroused the Court's suspicion regarding the propriety of the relevant conduct of Lewis and Trachten, it was not sufficient to support a conclusion that the exploitative conduct of either or both in fact constituted a fraud, defalcation, embezzlement, larceny, or willful and malicious act.

Second, even if the Plaintiffs had established Lewis' and/or Trachten's illicit conduct and state of mind, this Court would decline, as a matter of law, to impute that conduct and mindset to the Defendant under the circumstances of this case. While the majority of courts to have considered the agency issue under the Bankruptcy Code have concluded that imputation of elements of dischargeability is appropriate, *e.g., In re Ledford*, 970 F.2d 1556, 1561–62 (6th Cir.1992), the vast majority of those courts, as well as the seminal pre-Code authorities, *e.g., Strang v. Bradner*, 114 U.S. 555, 561, 5 S.Ct. 1038, 1041, 29 L.Ed. 248 (1885), involved relationships between *partners*, and the *mutual* agency principles inherent therein. Because this Court believes that Congress intended the discharge exceptions of Section 523(a)(2),

---

**7.** One Circuit Court of Appeals has ruled that a technical conversion of property, even with "knowledge that legal rights are being violated", may not be "malicious" within the meaning of Section 523(a)(6) absent "aggravated circumstances". *In re Long*, 774 F.2d 875, 881 (8th Cir.1985). Certainly no aggravating circumstances are present in the Defendant's conduct in this proceeding.

**8.** The Plaintiffs argue that their mortgage constituted a fee simple interest in the Putnam Property. Consequently, they assert, the Defendant's sale of the Putnam Property to SMI caused an injury to that fee simple interest. However, as noted in fn. 5, *supra*, the Plaintiffs ignore the legal fact that the Defendant could only convey *his* interest in the Putnam Property; he could not, and did not, materially affect *their* interest by selling his interest.

(4) and (6) to correlate as closely as possible to *individual* moral culpability, it will resist extending dischargeability imputation beyond the mutual agency principles inherent in a partnership relationship. Accordingly, because no partnership, or other relationship giving rise to mutual agency principles, existed between the Defendant and Lewis and/or Trachten, the dischargeability of the subject debt should not be impaired by the conduct and scienter of third parties such as Lewis and Trachten.

### VI. CONCLUSION

Upon the foregoing Findings of Fact and Conclusions of Law, judgment shall enter in favor of the Defendant on the Plaintiffs' Complaint.