In re James W. CAPELLI, Debtor.

Leslie Capelli Burbank, Plaintiff,

v.

James M. Capelli, Defendant.

Bankruptcy No. 95–32441.
Adversary No. 96–3032.

United States Bankruptcy Court, D. Connecticut.

April 17, 2001.

---

Laura S. Mitler, Laura S. Mitler, P.C., West Haven, CT, for Plaintiff.

Raymond J. Lemley, New Haven, CT, for Defendant.

## MEMORANDUM OF DECISION ON COMPLAINT DETERMINING DISCHARGEABILITY OF DEBT

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

In this adversary proceeding, Leslie Burbank (hereafter, the "Plaintiff"), the former spouse of the Debtor, James M. Capelli (hereafter, the "Defendant"), seeks a determination of nondischargeability of a debt of $20,000.00, plus interest, that arose from a separation agreement incorporated into a judgment of dissolution of the parties' marriage. The Plaintiff argues that the subject debt should be excepted from discharge: (i) under Bankruptcy Code Section 523(a)(2)(A) because the debt was incurred as a result of "false pretenses, false representations, and actual fraud by the Plaintiff;" (ii) under Code Section 523(a)(2)(B) because the Defendant submitted a false financial statement upon which the Plaintiff reasonably relied in agreeing to modify a debt in connection with the separation agreement; and (iii) under Section 523(a)(15)(B) because discharging the debt would result in detrimental consequences to her that would outweigh the benefit of the discharge to the Defendant. Having now considered the entire record, and for the reasons stated hereafter, the Court determines the subject debt to be nondischargeable pursuant to Section 523(a)(2)(B).

### II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant matter by virtue of 28 U.S.C. § 1334(b); and this Court derives

its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. § 157(a)(b)(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(I).

## III. PROCEDURAL BACKGROUND

On November 15, 1995, the Defendant filed a voluntary petition under Chapter 7 of the Bankruptcy Code. According to the Defendant's Schedules, he possessed no real property, see Schedule A, owned personal property of $5,650.00, see Schedule B, was liable on one secured claim in connection with a car loan in the amount of $5,173.00, see Schedule D,[1] and was obligated for unsecured nonpriority claims of $336,140.60, including the subject debt, see Schedule F. The Defendant was also unemployed, supporting a 17 year-old son, and spent $1,634.00 monthly for expenses, including rent of $700.00 and a car payment of $272.00. See Schedules I, J.[2]

On February 20, 1996, the Plaintiff filed a timely two-count Complaint Objecting to Dischargeability of Debt (hereafter, the "Complaint"). Count One of the Compli-

ant is based upon a claim that the Defendant induced the Plaintiff to enter into a separation agreement "through false pretenses, false and misleading representations and/or actual fraud." Complaint at ¶ 18.[3] Count Two alleges that the Plaintiff has suffered financial hardship that outweigh the benefits of a discharge to the Defendant, and the debt is thus nondischargeable under § 523(a)(15)(B).

At trial, the Court received the testimony of (i) William Gallagher, Esq., the attorney who represented the Defendant in, inter alia, his marital dissolution proceeding, and a relevant personal injury action; (ii) Carl Tarantelli, the Pastor of the Living Water of Christ Church; (iii) the Plaintiff; and (iv) the Defendant. The Court also admitted several exhibits into evidence and heard the argument of counsel. From these sources, the Court derives the following facts.

## IV. GENERAL FACTUAL BACKGROUND

The parties were married on December 28, 1992. Beginning in July, 1992, and at

---

1. The bulk of the Defendant's personal property consisted of a 1990 Chrysler automobile which he valued at $4,000.00, and against which Chrysler Credit Corporation ("Chrysler") held a security interest of $5,985.54. On February 21, 1996, Chrysler moved pursuant to Section 362(d) for relief from the automatic stay of Section 362(a) in order to exercise its rights against that automobile. That motion was granted on March 5, 1996, and the car was subsequently repossessed by Chrysler.

2. The Defendant testified that he became employed by Corporate Staff Services on December 1, 1995, subsequent to the bankruptcy filing, and remained at that position until the first week in April of 1996. He was then employed by Jan Carpet. At the time of trial, he was able to pay his bills, including an additional sum of $250.00 per week for back rent imposed by order of a state court. At that time, his son had graduated from high

school, still resided with him and was working.

3. In Count One of the Complaint, the Plaintiff asserted a cause of action under Section 523(a)(2) without specifying subsection (A) or (B). See Complaint at ¶ 21. Count One closely tracks the language of Section 523(a)(2)(A). See Complaint at ¶ 18. At trial, the Plaintiff solicited testimony seeking to establish her claim under both subsections (A) and (B). The bulk of the Plaintiff's post-trial Memorandum of Law focuses on subsection (B) and Section 523(a)(15)(B). It is on this basis that the Court finds that actions under Section 523(a)(2)(A) and (B), as well as Section 523(a)(15)(B), are properly before it. See, e.g., Bankruptcy Rule 7015(b) ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.")

various times through February, 1994, the Plaintiff loaned a total of $29,690.00 to the Defendant (hereafter, the "Original Debt"), to assist him in meeting his financial obligations. The Original Debt funds were expended by the Defendant by way of (i) at least ten payments totaling more than $11,000.00 on a second mortgage debt that was taken out on the Defendant's mother's home for the Defendant's benefit; (ii) a loan of $5,500.00 that was invested in a failed business; (iii) payment of $6,000.00 on a credit card debt; (iv) and payment of approximately $775.00 associated with the Defendant's triple bypass operation in May of 1993, for which he was covered under the Plaintiff's health insurance. The remainder of the Original Debt included monies advanced to pay utility bills, dental bills, JC Penney, and to provide gas and insurance for the Defendant's car.

The parties were divorced on September 9, 1994, pursuant to the entry of a judgment of dissolution of marriage in the Superior Court for the State of Connecticut, Judicial District of New Haven (hereafter, the "Judgment"). The Judgment incorporated a Separation Agreement of the same date between the parties (hereafter, the "Agreement"). Pursuant to paragraph 9 of the Agreement, the Plaintiff agreed to accept $20,000.00 in full settlement of the Original Debt (hereafter, the "Modified Debt"). The Defendant agreed to repay the Modified Debt from the net proceeds of a personal injury action then pending in state court (hereafter, the "Lawsuit"), and

agreed to execute a promissory note to that effect (hereafter, the "Note"). Pursuant to the terms of the Note, the Defendant agreed to repay the Modified Debt, without interest, by the earlier of June 27, 1996, or within thirty days of the settlement of the Lawsuit. In the event the Modified Debt was not timely paid, it was agreed that interest would accrue at the rate of 10% per annum. In connection with the divorce proceeding the Defendant also submitted a sworn Financial Affidavit, dated September 9, 1994 (hereafter, the "Financial Affidavit"), listing total liabilities of $268,448.31.

On April 4, 1995, the Lawsuit was settled for $85,000.00 (hereafter, the "Gross Proceeds"), triggering pursuant to the aforementioned terms of the Note, an obligation by the Defendant to repay the Plaintiff the Modified Debt on or before May 4, 1995.[4] However, upon learning of the settlement, the Defendant authorized his attorney to make distribution of the Gross Proceeds according to a written accounting (hereafter, the "Accounting") which, *inter alia, excluded payment to the Plaintiff*,[5] and *included a payment of $22,595.45 to himself* (hereafter, the "Net Proceeds").[6] The Defendant also *instructed his attorney not to tell his former spouse of the settlement*, representing to his attorney that he was going to make an agreement with her with respect payment of the Modified Debt out of the Net Proceeds and by instalments.[7]

---

4. Approximately, two weeks earlier, by letter dated March 15, 1995, the Plaintiff's Attorney wrote the Defendant's Attorney stating, *inter alia*, "[a]s you are aware, my client, Leslie Burbank, is due the sum of $20,000.00 out of any sums realized from the [Lawsuit]. Would you please be good enough to advise my office as to the status of this suit." The response was immediate and short—"Mr. Capelli's personal injury [Lawsuit] is still pending."

5. The Accounting carved out and excluded from payment, *inter alia*, "Amount due pursuant to divorce decree and promissory note . . . . . . . . . . $20,000.00."

6. The Accounting authorized "NET PROCEEDS TO JAMES CAPELLI $22,595.45."

7. The concluding paragraph of the Accounting corroborates this representation and states in pertinent part: "I James Capelli au-

The Defendant, however, failed to make any payment to the Plaintiff from the Net Proceeds. Instead, on April 11, 1995, the Defendant paid a total sum of $13,000.00 from the Net Proceeds for tithes and offerings to his Church, the Living Water of Christ Church.[8] The remainder of the Net Proceeds was depleted by the Debtor in (i) repayment of debts to his mother; (ii) bringing his bills current—including car payments and rents—and (iii) for current expenses such as food and utility charges.

In July, 1995, the Defendant visited the Plaintiff at her home, notified her generally of the settlement of the Lawsuit, and unsuccessfully attempted to make other arrangements for repayment of the Note. Following, and as a result of an August 10, 1995, letter, and subsequent phone calls, from the Plaintiff's attorney to the Defendant's attorney, the Defendant, during the week of October 12, 1995, authorized his attorney to advise the Plaintiff formally of the specifics of the settlement. On October 12, 1995, counsel for the Plaintiff received written notification[9] from the Defendant's attorney of the date and amount of settlement of the Lawsuit.[10]

On October 20, 1995, the Plaintiff filed in state court a Motion for Contempt and Application for Order to Show Cause (hereafter the "Contempt Motion"), seeking sanctions for the Defendant's failure to comply with the Judgment, which had incorporated the terms of the Agreement. On November 15, 1995, at the Contempt Motion hearing, the Defendant sought a continuance which was denied—however, the state court then recessed for one hour. The Defendant filed his Chapter 7 petition within that hour.

## V. DISCUSSION

■ The Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1309 (2d Cir.1996) ("It has long been the law that the privilege of discharge depends upon the debtor's disclosure of a true and accurate picture of [his] financial affairs" (citations omitted)). The entitlement of the debtor to a fresh start is therefore not absolute but must be assessed in light of the circumstances before

thorize disbursement as above. I recognize there are insufficient proceeds to pay ... my former wife pursuant to the agreement in the divorce judgment. These debts will be paid by me *as best I can from the net proceeds and from my own instalment payments.* I authorize Attorney Gallagher to make the disbursements as appears above, and no others." (emphasis added).

**8.** A Chapter 7 trustee was appointed on December 1, 1995. On March 27, 1997, the trustee commenced adversary proceeding No. 97–3065 against Living Water of Christ Church to recover amounts that were either fraudulently or preferentially transferred. On December 22, 1997, an order entered granting the trustee's motion to compromise those claims for $2,000.00. On April 14, 1997, the trustee commenced adversary proceeding No.

97–3073 against Good News Center, another Church to which the Defendant had tithed and made offerings. That matter settled on September 10, 1997, for $2,000.00. As a result, a *Notice of Need to File Proof of Claim Due to Recovery of Assets* entered on February 5, 1998, requiring proofs of claim to be filed by May 6, 1998. On April 2, 1998, the Plaintiff filed a proof of claim for $21,060.30.

**9.** As part of the communication, the Plaintiff's attorney received the written Accounting of the distribution of the Gross Proceeds.

**10.** It was through this October 12, 1995, letter and attachments that the Plaintiff first learned of her former husband's instruction to his attorney not to reveal to her the existence or details of the settlement without his prior authorization.

the court. *See Cohen v. de la Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998) (The Bankruptcy Code "has long prohibited debtors from discharging liabilities incurred on account of their fraud"). Embodying and animating this fundamental policy of affording relief only to honest but unfortunate debtors, the Bankruptcy Code affords challenges to a debtor's entitlement to a general discharge, *see* Section 727, and prevents the discharge of particular debts, *see* Section 523(a).

■■■ With the advent of Section 523(a) and the ability to except certain debts from discharge, Congress determined that the creditor's interest in recouping full payment of certain debts outweighed the debtor's interest in an unqualified fresh start. *Grogan v. Garner, supra,* 498 U.S. at 287, 111 S.Ct. 654. Exceptions to discharge are, however, to be narrowly construed in favor of the debtor. *E.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio),* 91 F.3d 296, 300 (2d Cir.1996); *Bethpage Federal Credit Union v. Furio (In re Furio),* 77 F.3d 622, 624 (2d Cir.1996). Section 523(a) places the burden upon the creditor to establish the nondischargeability of its debt by a preponderance of the evidence. *Grogan v. Garner, supra,* 498 U.S. at 291, 111 S.Ct. 654.

■■■ A preliminary question—whether the Modified Debt qualifies as a debt for "money, property, services, or an extension, renewal, or refinancing of credit" un-der Section 523(a)(2)[11]—is implicated in the Section 523(a)(2)(A) and (B) analysis. The Court concludes that the Agreement, Note and Modified Debt, at a minimum, constitute a "renewal" of the Original Debt.

Black's Law Dictionary defines "renewal" to include the "substitution of a new right or obligation for another of the same nature." *Black's Law Dictionary* 1165 (6th ed.1990). Here, the Agreement provided for the Note. Pursuant to the Note, the Defendant became obligated to repay $20,000.00 instead of $29,000.00. The Note also provided for interest payment of 10%. Thus, the nature of the Modified Debt remained the same, but the rights and obligations were changed sufficiently to qualify as a "renewal" under § 523(a)(2)(B).[12]

The fact that new funds were not advanced does not change that result. The plain reading of the statute does not require the procurement of additional funds. *See Cho Hung Bank v. Kim (In re Kim),* 163 B.R. 157, 159 (9th Cir. BAP 1994). *Cf. Wolf v. Campbell (In re Campbell),* 159 F.3d 963, 964 (6th Cir.1998) ("extension of indebtedness is nondischargeable even though the creditor is unable to show additional damages arising therefrom"); *In re Britton,* 950 F.2d 602, 604 (9th Cir.1991) (extension of credit does not require an advance of further funds); *Cheyenne Mountain Bank v. Duncan (In re Duncan),* 123 B.R. 383, 386 (Bankr.C.D.Cal. 1991) (same).

---

**11.** Section 523(a)(2) provides in pertinent part as follows:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt-
>
> (2) *for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by-*

11 U.S.C § 523(a)(2)(1995) (emphasis added).

**12.** The Court notes that the Modified Debt may also qualify as a "refinancing" of credit. *Blacks Law Dictionary* defines that term to include extending the "maturity date and/or [increasing] the amount of an existing debt." The fact that the Modified Debt decreased should not limit the application of the term to the facts here.

## A. Dischargeability Under § 523(a)(2)(A)

Section 523(a)(2)(A) provides in pertinent part as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition:

11 U.S.C. § 523(a)(2) (1995).

■ In order to prevail under Section 523(a)(2)(A), the Plaintiff must establish that the Defendant:

(i) made representations, other that statements, respecting the debtor's financial condition,[13]

(ii) knowing them to be false,

(iii) with the intention and purpose of deceiving the Plaintiff,

(iv) upon which the Plaintiff justifiably relied, and

(v) which caused the Plaintiff to sustain damages.

*E.g., Ramos v. Rivera (In re Rivera),* 217 B.R. 379, 384 (Bankr.D.Conn.1998).

■ Initially, the Court notes that the phrase "to the extent obtained by" "makes clear that the share of money ... that is obtained by fraud gives rise to a nondischargeable debt." *Cohen, supra,* 118 S.Ct. at 1216, 118 S.Ct. 1212. To sustain a claim of nondischargeability under Section 523(a)(2)(A) the Plaintiff therefore must make a threshold showing that the alleged "fraud ... existed at the time of, and has been the methodology by which, the money, property or services were obtained." *Wilcoxon Construction, Inc. v. Woodall (In re Woodall),* 177 B.R. 517, 523 (Bankr. D.Md.1995). That is to say, the "funds themselves must have been obtained by fraud in the inception." *Community Nat'l Bank v. Slominski (In re Slominski),* 229 B.R. 432, 435 (Bankr.D.N.D.1998) (citation and internal quotation marks omitted). Misrepresentations that are made subsequent to the creation of the debt "have no effect upon the dischargeability of a debt, since the false representation could not have been the creditor's reason for the extension of credit." *In re Woodall, supra,* 177 B.R. at 524 (citation and internal quotation marks omitted).

■ The Plaintiff argues generally that the Defendant, "through false pretenses, false and misleading representations and/or actual fraud, acted to induce [the Plaintiff] to enter into the [Agreement] for valuable consideration, and in the absence of said false pretenses, false representations, and/or actual fraud by [the Defen-

---

**13.** By its terms, subsection (a)(2)(A) of Section 523 excludes from its ambit any "statement"—written or oral—"respecting ... financial condition." Therefore, unless excepted from discharge by some provision of Section 523 other than subsection (a)(2)(A), any debt induced through the use of false or fraudulent statements regarding financial condition is dischargeable. As discussed hereafter, such provision does exist—in the form of subsection (a)(2)(B)—but only for statements "in writing". *See, e.g., Bellco First Federal Credit Union v. Kaspar (In re Kaspar),* 125 F.3d 1358, 1362 (10th Cir.1997); *cf., Field v. Mans,* 516 U.S. 59, 66, 116 S.Ct. 437, 441, 133 L.Ed.2d 351 (1995) (discussing relationship of subsections (a)(2)(A) and (B)). Accordingly, the Financial Statement misrepresentations, discussed in connection with Section 523(a)(2)(B), *infra,* are not relevant or engaged in the Section 523(a)(2)(A) calculus. No provision of Section 523 creates a dischargeability cause of action for *oral* misrepresentations regarding financial condition. *E.g., Blackwell v. Dabney (In re Blackwell),* 702 F.2d 490 (4th Cir.1983).

dant], [the Plaintiff] would not have entered into the [Agreement] and incurred the losses attributable to the [the Defendant]." Complaint at ¶ 18. The Court concludes that the Plaintiff has not satisfied the requisite threshold showing because no fraudulent acts and/or representations by the Defendant, other than those within the written Financial Statement, occurred prior to the creation of the Original or Modified Debt.

The evidence establishes that the Plaintiff loaned money to the Defendant in reliance upon repayment from the Lawsuit which the Defendant represented to her would yield at least $400,000.00. The Defendant alluded to the expected Lawsuit recovery, and used it as a "carrot," each time he sought to obtain money from the Plaintiff. The Plaintiff, however, presented no evidence that the Defendant's relevant representations were false. In fact, William Gallagher, Esq., the Defendant's attorney in the Lawsuit, testified that he had initially attributed a value of $500,000.00 to the Lawsuit.

The Plaintiff's argument that the Modified Debt was procured through "religiosity," and the Defendant's false representation that he was a Christian who paid his debts and did not believe in bankruptcy is also unavailing. There is no question that the Plaintiff, as she testified, was outraged that a "religious" person, as the Defendant repeatedly represented himself to be, would act in the manner that the Defendant did with respect to his obligation to repay the Modified Debt. That outrage, however real and justified, is insufficient to refute the Defendant's religious beliefs as

then stated, or conclude that he falsely represented his "religiosity." [14]

The Plaintiff also relies on the fact that upon the settlement of the Lawsuit in April, 1995, the Defendant (i) did not inform her of the settlement in any manner until July, 1995, (well beyond the thirty days in which she was to be paid—and long following distribution of the Gross and Net Proceeds ), (ii) told her first that he had *not* settled the case, and later that he had received only $2,500.00, (iii) instructed his attorney not to furnish any details of the Lawsuit settlement to her, and (iv) terminated his employment to prevent a wage garnishment. [15] Those acts, even if performed with a fraudulent intent, occurred after the creation of the Modified Debt, and were not acts which led to the advancement of funds susceptible to a Section 523(a)(2)(A)-based nondischargeability judgment. Even though the Plaintiff has established that the Defendant is a liar, because the Plaintiff is unable to satisfy the threshold requirement that the Defendant's fraudulent acts and/or false statements actually induced the Modified Debt, Section 523(a)(2)(A) affords her no relief.

### B. Dischargeability Under § 523(a)(2)(B)

██ The Plaintiff next argues that her reasonable reliance on a materially false Financial Statement in entering into the Agreement provides a sufficient basis for finding the Modified Debt nondischargeable under § 523(a)(2)(B).

That Section provides:

14. The Plaintiff also contends that the Defendant was deceitful in his representation that he would repay the Modified Debt because he was aware at the time that he would not repay it, even when he had the opportunity. That contention is not supported by the evidence.

15. On October 30, 1995, just prior to the hearing on the Contempt Motion, the Defendant terminated his employment with Home & Life Security.

(a) A discharge under section 727... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive ....

11 U.S.C. § 523 (a)(2)(B) (1995).

The Court must now determine whether the "renewal" of credit, that is, the Modified Debt, was obtained by a false financial statement in accordance with the elements enumerated in Section 523(a)(2)(B).

*Materially False Statement*

■■■ A statement is materially false if it "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *In re Furio, supra.* 77 F.3d at 625 (citations and internal quotations marks omitted). Further, "writings containing pertinent omissions may qualify as 'materially false' for purposes of a section 523(a)(2)(B) violation." *European American Bank v. Launzel–Pennes (In re Launzel–Pennes),* 191 B.R. 6, 11 (Bankr. E.D.N.Y.1996) (citation omitted). *See also North Shore Savings and Loan Assoc. v. Jones (In re Jones),* 88 B.R. 899, 903 (Bankr.E.D.Wis.1988) ("The omission, concealment or understatement of any of the debtor's material liabilities constitutes a 'materially false' statement").

The Defendant's sworn Financial Affidavit listed total debts of $268,448.31. Testimony of the Defendant at trial established that the Financial Affidavit failed to include liabilities of more than $137,000.00. The failure to include that substantial additional debt painted a "substantially untruthful" picture of the Defendant's financial condition.

*Statement Regarding Defendant's Financial Condition*

In a dissolution proceeding, each party is required to file statements of "current income, expenses, assets and liabilities." *See Connecticut Civil Practice Book* § 25–30(a) (West 1994). The Financial Affidavit complied with that provision and clearly relates to the financial condition of the Defendant.

*Reasonable Reliance*

■■■ Addressing the requirement of "reasonable reliance," the United States Court of Appeals for the Second Circuit has observed:

Once it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith. Reasonableness is therefore a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith .... The reasonableness of reliance requires the fact finder to consider the totality of the circumstances.

*In re Bonnanzio, supra,* 91 F.3d at 305 (citations and internal quotation marks omitted). *See also In re Cohn, supra,* 54 F.3d at 1117 (A creditor's reasonableness should be judged objectively, *i.e.,* expecting "that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances"). "It is sufficient

that the creditor's reliance on the [d]ebtor's representations was a contributing factor in causing the loss even though such reliance was partial and not solely motivated by the [d]ebtor's false representations." *Barristers Abstract Corp. v. Caulfield (In re Caulfield),* 192 B.R. 808, 821 (Bankr. E.D.N.Y.1996) (citation omitted). *See also In re Launzel–Pennes, supra,* 191 B.R. at 14 ("even partial reliance by a creditor on a false financial statement may be sufficient for a section 523(a)(2)(B) violation").

The Court concludes that the Plaintiff reasonably relied on the Financial Affidavit. The document was prepared in the context of a divorce proceeding and its truthfulness was sworn to by the Defendant. That document was then submitted to the state court. Viewing the totality of the circumstances, it would be reasonable for a "reasonably cautious person" to rely on the Financial Affidavit. The Plaintiff testified that she agreed to repayment from the settlement through the Modified Debt after she reviewed the Financial Affidavit, and because the expected recovery amount was represented to be at least $400,000.00. She testified further that if the Financial Affidavit had reflected the true state of the Defendant's financial condition, she would not have made the Agreement but "would have asked [her attorney] for a different direction to take." Plainly, the "substantial untruth" in the Financial Affidavit was a major factor in the Plaintiff's decision to enter into the Agreement.

The Plaintiff also testified that the Defendant had previously represented to her that Carl Tarantelli, the Defendant's pastor at Living Water of Christ Church, had advised him that tithing on the sums recovered from the Lawsuit would be unnecessary as the injury for which the Lawsuit was instituted occurred prior to the Defendant joining the Church. The Plaintiff

stated that while she expected the Defendant to make a donation from the Lawsuit funds, she did not believe it would be as significant as $13,000.00. That testimony further supports the reasonableness of the Plaintiff's reliance because at least 10% of the expected funds would have become available, which in this case was projected to be $40,000.00 to $50,000.00—more than enough to pay the Modified Debt. Further, if the expected judgment was to be $500,000.00, as testified to by the Defendant and his attorney, or $400,000.00 as the Plaintiff was told by the Defendant, a reasonable individual would not expect any debt to be omitted from the Financial Affidavit since sufficient funds would have been available to pay all creditors. Even if the Plaintiff did not rely wholly or solely on the Financial Affidavit, sufficient reliance springs from the facts presented here to satisfy the reasonable reliance prong of § 523(a)(2)(B).

*Intent to Deceive*

 Intent to deceive is rarely established by direct evidence. *See In re Cohn, supra,* 54 F.3d at 1118; *In re Caulfield, supra,* 192 B.R. at 821. Such intent may be inferred from the totality of the circumstances of the case, *see In re Bonnanzio, supra,* 91 F.3d at 301, or may be inferred "[w]here . . . a person knowingly or recklessly makes a false representation which the person knows or should know, will induce another to make a loan." *In re Furio, supra,* 77 F.3d at 625 (citation and internal quotation marks omitted). *See also In re Boice, supra,* 149 B.R. at 48. (reckless indifference or disregard for the accuracy of a financial statement amounts to an intent to deceive).

The evidence supports a finding of intent to deceive. The Defendant testified that he had knowledge that debts exceeding $137,000.00 were excluded from the Financial Affidavit. Both the Defendant

and his attorney offered explanations for the omissions, contending that the debts were omitted either because payments were contingent or the exact balances were not available. Neither one of those reasons can be interpreted to mean that the Defendant was not aware of, or not responsible for, the omitted liabilities. Indeed, the same explanations given at the trial of this proceeding could easily have been included in the Financial Affidavit. The purpose of the Financial Affidavit was to provide an accurate financial picture, and the omission of substantial liability significantly tainted that picture. At a minimum, the failure to include over $137,000.00 in debt in the Financial Affidavit constitutes reckless disregard and total indifference to the truth. Accordingly, this Court determines the requisite intent to deceive component of Section 523(a)(2)(B) is met here.

## VI. CONCLUSION

For the reasons stated herein, the Court finds that Section 523(a)(2)(A) affords the Plaintiff no basis for relief. However, because each of the elements of Section 523(a)(2)(B) has been satisfied, the Court concludes that the Modified Debt is non-dischargeable. Having concluded that the Modified Debt is excepted from discharge under Section 523(a)(2)(B), the Court declines to address the dischargeability of the debt under Section 523(a)(15)(B).

This Memorandum of Decision shall constitute this Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr.P. 7052. A separate judgment shall enter simultaneously herewith.