In re Raymond A. BARTOMELI, Jr., Debtor.

First National Insurance Co. of America, Plaintiff

v.

Raymond A. Bartomeli, Jr., Defendant.

Bankruptcy No. 00–32391(LMW).
Adversary No. 02–3139(LMW).

United States Bankruptcy Court, D. Connecticut.

Jan. 5, 2004.

Robert M. Barrack, Halloran & Sage, LLP, Hartford, CT, for Plaintiff First National Insurance Company of America.

Raymond A. Bartomeli, Jr., Shelton, CT, Pro se.

## MEMORANDUM OF DECISION

LORRAINE M. WEIL, Bankruptcy Judge.

The matter before the court is the above-captioned plaintiff's (the "Surety") complaint (Doc. I.D. No. 1, the "Complaint") seeking a determination that a debt owed by the above-captioned debtor (the "Debtor") to the Surety is nondischargeable pursuant to Bankruptcy Code § 523(a)(3)(B). This is a "core matter" within the purview of 28 U.S.C. § 157.

This memorandum constitutes the findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I. PROCEDURAL BACKGROUND

### A. The Chapter 7 Case

The Debtor commenced this case by a petition (Chapter 7 Case Doc. I.D. No. 1, the "Petition") filed on May 24, 2000 (the "Petition Date"). The Debtor did not file his bankruptcy schedules and statements with the Petition, but did file a "mailing matrix" with the Petition. (*See* Petition.) The Surety was not listed on the "mailing matrix." (*See id.*) On May 30, 2000, the Clerk's Office issued a notice of the chapter 7 case (Chapter 7 Case Doc. I.D. No. 2, the "Notice"). Among other things, that notice advised creditors that the last date for creditors to file complaints alleging the nondischargeability of debts under Bankruptcy Code § 523(a)(2) (a "Fraud Objection") was August 28, 2000 (the "Bar Date"). (*See* Notice.) The Notice was not sent to the Surety because the Surety was not listed on the "mailing matrix." On June 8, 2000, the Debtor filed his bankruptcy schedules and statements (Chapter 7 Doc. I.D. No. 5, collectively, the "Original Schedules"). The Surety was not listed as a creditor of the Debtor in the Original Schedules.[1] Accordingly, no subsequent notices in the case were sent to the Surety.

The Surety did not file a Fraud Objection on or before the Bar Date. The Debtor received his chapter 7 discharge on September 12, 2000. (*See* Chapter 7 Case Doc. I.D. No. 6.) However, because the chapter 7 trustee (the "Trustee") still was

---

1. Even if the Debtor's obligation to the Surety was only contingent and unliquidated as of the Petition Date, it has long been the law that the Surety was a "creditor" as of such date and should have been listed as such. *See, e.g., Maynard v. Elliott,* 283 U.S. 273, 51 S.Ct. 390, 75 L.Ed. 1028 (1931).

attempting to marshal the Debtor's assets for the benefit of his creditors, the case remained open. On April 1, 2002, the Debtor filed amended schedules (Chapter 7 Case Doc. I.D. Nos. 10, 11, and 12, collectively the "Amended Schedules"). Among other things, the Amended Schedules listed (for the first time) the Surety as a creditor in the amount of $500,000.00. (*See* Chapter 7 Case Doc. I.D. No. 11.) The Amended Schedules were served on the Surety by first-class mail on March 27, 2002. (*See* Chapter 7 Case Doc. I.D. No. 11 ("Certificate of Service" annexed to Amended Schedule).) The Trustee filed a report of "no distribution" on April 8, 2002 (*see* Chapter 7 Case Doc. I.D. No. 13) and the case was closed on April 10, 2002. On May 9, 2002, the Surety filed a motion to reopen this case (Chapter 7 Case Doc. I.D. No. 16) in order to obtain a determination of nondischargeability of the Debtor's debt to the Surety. The court granted that motion (over the Debtor's objection) by order dated August 7, 2002. (*See* Chapter 7 Case Doc. I.D. No. 26.)

### B. *The Adversary Proceeding*

This adversary proceeding was commenced by the Surety's filing of the Complaint on October 7, 2002. As explained more fully below, the Complaint seeks a determination that the below-described debt (the "Indemnity Debt") to the Surety is nondischargeable under Bankruptcy Code § 523(a)(3)(B). The Debtor's chap-

ter 7 counsel filed an appearance for the Debtor in this adversary proceeding on November 8, 2002.[2] Through counsel, the Debtor filed an answer (Doc. I.D. No. 6, the "Answer") on November 8, 2002. On May 9, 2003, the Debtor's counsel moved to withdraw as the Debtor's counsel in the adversary proceeding (*see* Doc. I. D No. 8) and the Debtor filed his *pro se* appearance (*see* Doc. I.D. No. 10). That motion was granted after a hearing without objection by the Debtor. (*See* Doc. I.D. No. 12.) Thereafter, the Debtor proceeded *pro se* in the adversary proceeding. Trial was had on the Complaint on August 18, 2003. The Debtor did not appear at the trial.[3] Two witnesses[4] testified for the Surety who also introduced documentary evidence. At the conclusion of the trial, the court took the matter under advisement. At the request of the court, the Surety filed a post-trial brief (Doc. I.D. No. 15, the "Post–Trial Memorandum").

### II. *FACTS*

At all relevant times, the Debtor was president of and a shareholder of the Bartomeli Company (the "Company"), a closely-held Connecticut corporation engaged in the business of construction contracting. It is common for a construction company to be required to post payment and performance bonds (collectively, "Construction Bonds") with the owner as a condition to the owner's entry into a construction

---

**2.** Counsel's "Disclosure of Compensation of Attorney for Debtor" dated June 7, 2000 specifically excluded "[r]epresentation of the debtor in adversary proceedings and other contested matters" from the scope of his representation. (Plaintiff's Exhibit H (Disclosure of Compensation of Attorney for Debtor).)

**3.** Notwithstanding the Debtor's failure to appear at the trial, this court ought not render judgment for the Surety unless warranted by the law and the facts. *Cf. In re Taylor*, 289 B.R. 379, 383 (Bankr.N.D.Ind.2003) ("[B]e-

fore a litigant is awarded the relief it seeks when the opposing party fails to respond, the court needs to satisfy itself that the facts before it demonstrate a[n] ... entitlement to such relief.").

**4.** Those witnesses were Paul McCarthy and Trevor Hash. Paul McCarthy is a senior account specialist, contract surety underwriter of the Surety. Trevor Hash is the area manager in Massachusetts of the Surety.

contract with the contractor.[5] From and after about June 3, 1997, the Company had a relationship with the Surety whereby the Surety from time to time issued Construction Bonds for the Company in exchange for the payment of premiums to the Surety.

It is not unusual for a surety to require a bond principal to enter into an agreement requiring the bond principal to indemnify the surety for loss, costs and expense incurred by the surety in respect of the Construction Bonds as a result of the bond principal's default under the bonded construction contract.[6] With smaller contractors who are not natural persons, it is common for the surety to require certain individuals closely connected with the contractor also to enter into the same indemnity agreement. In accordance with the foregoing, the Company, the Debtor, Susan Bartomeli (the Debtor's wife) and one Luann Maraglino (collectively, the "Indemnitors")[7] executed and delivered to the Surety a certain General Agreement of Indemnity for Contractors dated June 3, 1997 (the "GCI"). (*See* Plaintiff's Exhibit A.) Pursuant to the GCI, the Indemnitors agreed to pay to the Surety upon demand (among other things):

[a]ll loss, costs and expenses of whatsoever kind and nature ... incurred by [the] Surety by reason of having executed any Bond, or incurred by it on account of any [d]efault under this agreement by any of the [Indemnitors] ....

(Plaintiff's Exhibit A.)[8]

On or about December, 1999, the Company entered into a subcontract (the "Woodland Subcontract") with O & G Industries, Inc. (apparently the general contractor) whereby the Company agreed to furnish labor, materials and equipment with respect to a certain construction project hereafter referred to as the "Woodland Project." Pursuant to the Woodland Subcontract, the Company was required to post Construction Bonds. The Company applied to the Surety for the issuance of those bonds. It was the Surety's practice to underwrite separately each bond request by a bond principal. To that end, the Surety required the Indemnitors periodically to submit updated financial statements to the Surety for review. The Debtor had submitted to the Surety an unaudited financial statement as of September 30, 1999 (Plaintiff's Exhibit B, the "1999 Statement"). On or about December 1, 1999, the Surety completed its underwriting process and exe-

---

**5.** A performance bond is a guarantee to the owner ... that the project will be completed per the plans and specifications for the contract price.... [T]he payment bond is a guarantee that guarantees the owner ... that all subcontractors, suppliers ... [and] material[men] ... will be paid for the project. So that the risk of non[sic] performance of the contractor falls to the surety and not to the owner.

Transcript of 8/18/03 trial (the "Transcript") at 14 (testimony of Mr. McCarthy).

**6.** Even without such a contract, the defaulting bond principal is required to indemnify (reimburse) the surety as a matter of law for such loss. *See* Restatement (Third) of Suretyship and Guaranty § 22 (1996).

**7.** Ms. Maraglino appears to have been an officer (secretary) of the Company. The Debtor appears to be the only Indemnitor who is a debtor under the Bankruptcy Code.

**8.** "Bond" is defined in the GCI as "[a]ny and all bonds" issued by the Surety from time to time on the Company's behalf. (*See* Plaintiff's Exhibit A.) As noted above, the GCI is enforceable "on demand." The Surety alleged the requisite "demand" in the Complaint (*see* Complaint ¶ 23), but the Debtor denied that allegation in the Answer. (*See* Answer ¶ 23.) There was no proof of demand at trial. However, the Surety still has at least a contingent debt against the Debtor even without a demand.

cuted and delivered Construction Bonds on the Company's behalf in respect of the Woodland Project (the "Woodland Construction Bonds"). The penal sum of each of the Woodland Construction Bonds was $5,580,879.00.[9]

As noted above, the Debtor commenced this chapter 7 case on May 24, 2000 but did not list the Surety in his "mailing matrix" or in the Original Schedules. Sometime after the commencement of this chapter 7 case and without advising the Surety of the pendency of this case, the Debtor provided the Surety with an updated (unaudited) financial statement as of September 30, 2000 (Plaintiff's Exhibit E, the "2000 Statement"). Sometime after the commencement of this chapter 7 case but before the Surety received a copy of the Amended Schedules, the Company (without notifying the Surety of the pendency of this case) requested the Surety to issue a "bid bond"[10] on its behalf in respect of the construction of a project known as "Reconstruction of Route 67 at West Street and Park Road in the Town of Oxford" (the "ConnDOT Project").[11] Accordingly, the Surety issued a bid bond (the "Bid Bond") on behalf of the Company in respect of its bid on that project. The Company was the successful bidder on the ConnDOT Project and the Company re-quested the Surety to issue Construction Bonds in respect of the ConnDOT Project. In the meantime, the Surety had received a copy of the Amended Schedules and (for the first time) became aware of this chapter 7 case. However, because the Company's failure to post the requisite Construction Bonds would have triggered a claim on the Bid Bond, the Surety issued Constructions Bonds in respect of the ConnDOT Project (the "ConnDOT Construction Bonds") in May, 2001 and hoped for the best.

The Company failed to pay in full all subcontractors and suppliers in respect of the Woodland Project. Demands were made on the Woodland Construction Bonds and, as of the date of trial, the Surety had sustained losses of approximately $733,000 in respect of those bonds. The Company also defaulted with respect to the ConnDOT Project. However, the Surety was able to obtain a replacement contractor which completed the ConnDOT Project with no loss to the Surety. Accordingly, the ConnDOT Construction Bonds are not at issue[12] here and the 2000 Statement is relevant only for purposes of comparison.

### III. *THE COMPLAINT*

The Complaint seeks (among other things) a determination that the Indemnity

---

9. The penal sum of a bond is the limit of the surety's liability thereon.

10. Where bids are to be received for the construction or improvement of public works, it is often required that with his bid each bidder provide security for the execution of the contract if awarded to him. While in the majority of instances in which security is furnished for this purpose it is made in the form of a cash deposit or check, there are other instances in which the security provided is a bond, commonly called a "bid bond" . . . .

L.S. Tellier, Annotation, *Surety's Liability on Bid Bond for Public Works*, 70 A.L.R.2d 1370 § 1[a], 1960 WL 13172 (1960). In this case,

the Bid Bond had a penal sum of twenty-five percent of the Company's bid on the ConnDOT Project. (Transcript at 31 (testimony of Mr. Hash).)

11. The questions of whether that bond transaction was even covered by the Debtor's GCI or constituted a postpetition fraud upon the Surety by the Company and/or the Debtor are not before the court. That is because, as noted below, the Surety did not prosecute the Complaint with respect to the ConnDot Construction Bonds.

12. Accordingly, "Indemnity Debt" as used herein refers only to debt in respect of the Woodland Construction Bonds.

Debt is nondischargeable pursuant to Bankruptcy Code § 523(a)(3)(B).[13] The Complaint alleges that the Surety was neither "listed nor scheduled" within the purview of Section 523(a)(3) in time to permit the Surety timely to file a Fraud Objection and that the Surety did not have notice or actual knowledge of this chapter 7 case until after the Bar Date had passed. The Complaint further alleges that the Surety relied upon the 1999 Statement in issuing the Woodland Construction Bonds "because it appeared that the Debtor had sufficient financial resources to indemnify the . . . [Surety] for losses that might be incurred by the . . . [Surety] under the Woodland [Construction] Bonds." (Complaint ¶ 16 at 5). The Complaint alleges that the 1999 Statement was materially false in that the 1999 Statement

> represented that the Debtor had total assets of $639,406 and total liabilities of $151,502, for a total net worth of $487,904 . . . . However, . . . [w]hen the Debtor filed his [c]hapter 7 [p]etition on May 24, 2000, only approximately five months after the . . . [Surety] was induced to issue the Woodland [Construction] Bonds, the [Original S]chedules . . . indicate that the Debtor's total assets were $176,269.56 and his total liabilities

were $521,491.31, for a total net worth of negative $345,221.75.

(Complaint ¶ 16 at 5–6.)

The Complaint further alleges that:

> [t]he Debtor knew that the . . . [Surety] had issued, and would continue to issue, . . . [Construction Bonds] on behalf of the . . . Company, in reliance upon the Debtor's materially false financial statement[ ] . . . . Accordingly, the . . . [Surety] had and has a colorable claim that the . . . [Indemnity Debt was] . . . nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

(Complaint ¶¶ 28, 29 at 9.) Moreover, the Complaint alleges:

> When the Debtor submitted . . . [the 1999 Statement] to the . . . [Surety] prior to the issuance of . . . the Woodland [Construction] Bonds . . ., this financial documentation was (1) knowingly and materially false; (2) respecting the Debtor's financial condition; (3) upon which the . . . [Surety] reasonably relied; and (4) that the Debtor caused to be made or published with the intent to deceive the . . . [Surety] into believing that the financial condition and prospects of the Debtor were stronger, healthier, and more stable than they in fact were . . . . As a result of the materi-

---

13. Section 523(a) provides in relevant part as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

. . . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . . . . .

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

. . . . . .

(3) neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

. . . . . .

(B) if such debt is of a kind specified in paragraph (2) . . . of this subsection, . . . timely request for a determination of dischargeability of such debt under . . . such paragraph[ ], unless such creditor had notice or actual knowledge of the case in time for such timely . . . request . . . .

11 U.S.C.A. § 523(a) (West 2003).

ally false financial documentation submitted to the ... [Surety] by the Debtor, the ... [Surety] was fraudulently induced into extending further credit and issuing additional [Construction B]onds on behalf of the ... Company. As a result of the Debtor's fraudulent inducement, the ... [Surety] has suffered extensive damages and losses under the Woodland [Construction] ... Bonds.

(Complaint ¶¶ 31, 32 at 10.)

## IV. *FINANCIAL DISCLOSURE*

In order to prove the falsity of the 1999 Statement, the Plaintiff relied at trial solely upon the Original Schedules and the 2000 Statement. Accordingly, each of the three documents (and the Amended Schedules) is compared and discussed below.

## A. *The 1999 Statement*

The first page (the "Cover Sheet") of the 1999 Statement bears the following title:

Raymond A. Bartomeli, Jr.

Personal Financial Statement

As of September 30, 1999

(Plaintiff's Exhibit B.) The Cover Sheet also recites certain "[p]ersonal [i]nformation" in respect of the Debtor. Included in that information is the fact that he was "[m]arried to Susan." (*See* Plaintiff's Exhibit A (Cover Sheet).) The Cover Sheet also has an entry for "Annual Salary." After that entry appears the following: "$80,600—Raymond, $10,000—Susan." (*See id.*) The remaining pages of the 1999 Statement appear as follows:

### ASSETS

Cash and Money Deposits:

| Depository | Type | In Name of | | Balance |
|---|---|---|---|---|
| Peoples Savings 07250961455 | Savings | Raymond Bartomeli, Jr. | | $ 3,500 |
| Webster Bank 0004011389 | Savings | Susan Bartomeli | | $ 2,500 |
| Peoples Savings 0110144381 | Checking | Raymond Bartomeli, Jr. | | $ 3,000 |
| Peoples Savings 0720096145 | Checking | Susan Bartomeli | | $ 1,500 |
| | | Subtotal | | $ 10,500 |

Life Insurance:

| Insurance Company | Type | Benefit Value | Beneficiary | Cash Value |
|---|---|---|---|---|
| Aetna Insurance | Whole | $200,000 | Children | $ 3,600 |
| Northwest Mutual | Whole | $100,000 | Children | $ 5,900 |
| New England Life | Variable Ordinary | $ 50,000 | Susan Bartomeli | $ 1,590 |
| | | | Subtotal | $ 11,090 |

Pension/Profit Sharing Plan:

| Description | Benefit | Beneficiary | | Vested |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Operating Engineers | $340/age 65 | Susan | | |
| Bartomeli, Co., Inc. | $34,506 | Susan | | $ 34,506 |
| | | Subtotal | | $ 34,506 |

| Depository | Type | In Name of | | Balance |
|---|---|---|---|---|
| Peoples Securities 072300021 | Retirement | Raymond Bartomeli, Jr. | | $ 1,790 |
| | | Subtotal | | $ 1,790 |

Schedule of Real Estate Owned:

| Property Address Title in Name of Mortgage Holder | Type | % of Ownrshp | Date Acqrd | Purchase Price | Market Value | Mortgage Balance |
|---|---|---|---|---|---|---|
| 74 Tuckahoe Dr. Shelton, CT Derby Savings Citifinancial | 1st 2nd | 100 | 1975 1994 | $ 42,500 | $260,000 | $ 82,000 $ 64,702 |
| | | | Subtotal real estate: | | $260,000 | $146,702 |

Non–Readily Marketable Securities: (Not pledged)

| No. of Shares | Description | Owner | Held By | Cost |
|---|---|---|---|---|
| 1000 | Bartomeli Co., Inc. | Raymond A. Bartomeli, Jr. | Owner | $ 1,000 |
| | | 09/30/99 Book Value | | $267,520 |
| | | Subtotal | | $267,520 |

Vehicles Owned:

| Description | Market Value |
|---|---|
| 1988 Jeep | $ 2,500 |
| 1978 Harley Davidson M.C. | $ 5,000 |
| 1996 Harley Davidson M.C. | $ 10,000 |
| 1989 Lincoln Town Car | $ 4,000 |
| 1990 Ford Bronco | $ 4,000 |
| Subtotal | $ 25,500 |

Other Personal Property:

| | Market Value |
|---|---|
| Recreational 4–wheeler | $ 500 |
| Jewelry | $ 14,000 |
| Gun Collection | $ 14,000 |
| Subtotal | $ 28,500 |
| TOTAL ASSETS | $639,406 |

## LIABILITIES

Schedule of Installment Loans/Credit Cards:

| Owed to | Account No. | Balance |
|---|---|---|
| Discover Card | 601101172503767 | $ 3,000 |

| | | | |
|---|---|---|---|
| CitiBank | 412800234382 | | $ 4,800 |
| | | Subtotal | $ 3,800 [sic] |

**Mortgages/Liens:**

| | | |
|---|---|---|
| Derby Savings | | $ 82,000 |
| Citifinancial | | $ 64,702 |
| | Subtotal | $146,702 |
| | TOTAL LIABILITIES | $151,502 |
| | NET WORTH | 487,904 |

The 1999 Statement includes Susan Bartomeli's annual income and certain assets expressly stated to be hers alone (i.e., a bank account at Webster Bank and a bank account at People's Savings). The 1999 Statement also lists certain assets as belonging to the Debtor alone (i.e., the remaining bank accounts, the People's Securities retirement account, and the "Non–Readily Marketable Securities").[14] The remaining assets (including the real estate which is discussed separately below) and the liabilities are listed without differentiation. Accordingly, although the Cover Sheet states that the 1999 Statement is a financial statement for the Debtor alone, the court finds that the 1999 Statement was the joint financial statement of the Debtor and his wife.[15] Also based upon the foregoing, the court infers that each asset or liability listed in the 1999 Statement without a specified owner/obligor is listed therein as a jointly owned or jointly owed asset or liability (as the case may be).

The entry in the 1999 Statement with respect to "Real Estate Owned" requires some separate discussion. The Surety asserts that the 1999 Statement shows the Debtor as the sole owner of the Shelton property (the "Real Property"). The court finds to the contrary. It is true that the 1999 Statement has a "% of Ownership" column for the real estate under which is listed "100." However, the Debtor's name does not appear in the "Real Estate Owned" section (as opposed to the "Non–Readily Marketable Securities", just below the "Real Estate Owned" section, where his name *does* appear). Accordingly, at most the 1999 Statement states that the Debtor and his wife jointly owned "100%" of the Real Property.

The 1999 Statement is "as of September 30, 1999." The record supports a finding that the 1999 Statement was delivered by the Debtor to the Surety some time after September 30, 1999 but before December 1, 1999. The record does not permit the court to refine the date of delivery any more precisely than that. Thus, the period between delivery of the 1999 Statement and the Petition Date could have been as long as seven months.

### B. *The Original Schedules*

■ As noted above, the Original Schedules were filed on June 28, 2000. The Original Schedules were signed by the

---

14. Based upon the Original Schedules (discussed below), the court finds that the "Pension/Profit Sharing Plan[s]" also belonged to the Debtor alone.

15. The foregoing is consistent with the fact that Susan Bartomeli was an Indemnitor along with the Debtor (and others).

Debtor under oath and, as such, constitute admissions usable against him. *See In re Bohrer*, 266 B.R. 200, 201 (Bankr.N.D.Cal. 2001) ("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions."). Accordingly, if a finding of fact revolves around a determination of which of two conflicting documents is correct—one of the Statements on the one hand or the Original Schedules on the other hand—the Original Schedules must be deemed to be correct.

Relevant points of comparison between the 1999 Statement and the Original Schedules are as follows. Consistent with the 1999 Statement, the Original Schedules show the Debtor as a joint owner of the Real Property with his wife. *(See* Plaintiff's Exhibit H (Schedule A—Real Property).) [16] Also consistent with the 1999 Statement, the Original Schedules show the People's Savings account # 0110144381 as the Debtor's. *(See* Plaintiff's Exhibit H (Schedule B—Personal Property).) However, the Original Schedules do not show People's Savings account # 07250961455 which appears in the 1999 Statement.

The Original Schedules show "2 pistols" listed in the value of $1,000.00 but do not show the remainder of a joint interest in the $14,000 gun collection listed in the 1999 Statement, or any interest in jewelry. *(See* Plaintiff's Exhibit H (Schedule B—Personal Property).) Consistent with the 1999 Statement, the Original Schedules

show a New England Life policy.[17] However, the Original Schedules do not show the Aetna Insurance or the Northwest Mutual policies that appear in the 1999 Statement. *(See* Plaintiff's Exhibit H (Schedule B—Personal Property).) The Original Schedules also show a "Pension/Profit Sharing" plan in a manner generally consistent with the 1999 Statement. *(See* Plaintiff's Exhibit H (Schedule B—Personal Property).) The Original Schedules further show a "People's Bank IRA" with a value of $3,720 which the court finds corresponds to the "Peoples Securities" account listed in the 1999 Statement in the amount of $1,790. *(See* Plaintiff's Exhibit H (Schedule B—Personal Property).)

The Original Schedules list "46% of stock ownership of ... [the Company]" (the "Stock") of an "unknown" "market value." (See Plaintiff's Exhibit H (Schedule B—Personal Property).) The 1999 Statement lists 1000 shares in the Company at a "book value" of $267,520.[18] The Original Schedules do not list any of the five motor vehicles (or recreational four-wheel vehicle) listed in the 1999 Statement. *(See* Plaintiff's Exhibit H (Schedule B—Personal Property).) Rather, the Original Schedules show only a 1994 Honda Prelude owned solely by the Debtor and valued therein at $9,000. *(See* Plaintiff's Exhibit H (Schedule B—Personal Property).)

On the liability side of the ledger, the mortgage debt reported in the 1999 Statement and the Original Schedules in respect of the Real Property generally corre-

---

**16.** The 1999 Statement lists the gross value of the Debtor's interest in the Real Property at $130,00 ($260,000 ÷ 2). The Original Schedules list the gross value of the Debtor's interest in the Real Property at $120,000. *(See* Plaintiff's Exhibit H (Schedule A—Real Property).) The $10,000 difference could reflect market activity and is not material.

**17.** The Original Schedules show a higher cash surrender value for the Policy (*i.e.*, $3,454.56) than does the 1999 Statement (*i.e.*, $1,590). *(See* Plaintiff's Exhibit H (Schedule B—Personal Property).)

**18.** The Surety questions the value of the Stock, not whether 1000 shares of stock is a forty-six percent ownership share of the Company.

sponds. (*Compare* 1999 Statement (above) *with* Plaintiff's Exhibit H (Schedule D—Creditors Holding Secured Claims).) However, the Original Schedules show a judgment lien in the amount of $350,246.31 (the "Judgment Lien") dated June 3, 1999 in respect of the Real Property which lien is listed as held by Thomas E. Bartomeli.[19] The Judgment Lien does not appear in the 1999 Statement.

The 1999 Statement shows two (joint) credit card debts: one in respect of a "Discover Card" in the amount of $3,000; and one in respect of Citibank account # 4128002343829284 for $4,800. The Original Schedules show the Citibank debt (as a joint debt) in the amount of $2,353.00 but does not show the Discover Card debt. However, the Original Schedules also show two additional joint credit card debts: a "Fleet Mastercard" debt in the amount of $1,093 and a second "Fleet Mastercard" debt in the amount of $878.00. The Original Schedules further show the following credit card debts as solely the obligation of the Debtor: an "MBNA America" debt in the amount of $3,200; a "Sears" debt in the amount of $1,200 and a "Wachovia" debt in the amount of $4,619. None of the foregoing five credit card debts appears in the 1999 Statement. (*Compare* 1999 Statement (above) *with* Plaintiff's Exhibit

H (Schedule F—Creditors Holding Unsecured Nonpriority Claims).)

The Original Schedules aver that (except for the Judgment Lien), the Debtor did not transfer "property, other than property transferred in the ordinary course of the business or financial affairs of the debtor ... within one year immediately preceding the commencement of this case." (Plaintiff's Exhibit H (Statement of Financial Affairs, item 10) ("Item 10").) The Original Schedules also aver that the Debtor had not "closed, sold or otherwise transferred within one year immediately preceding the commencement of this case" any "financial accounts and instruments held in the name of the debtor or for the benefit of the debtor ...." (*Id.*) [20]

### C. *The 2000 Statement*

The 2000 Statement is different from the 1999 Statement and/or the Original Schedules as follows. The 2000 Statement shows People's Savings account # 0110144381 with a balance of $1,773 (as opposed to the $3,000 stated in the 1999 Statement and the $100 stated in the Original Schedules). (*See* Plaintiff's Exhibit E.) The 2000 Statement also shows People's Bank account # 0115144381 with a balance of $1,504. That account does not appear on either the 1999 Statement or the Original Schedules and appears to

---

19. Thomas Bartomeli is a former shareholder of the Company. The judgment (the "Judgment") underlying the Judgment Lien arose from an action by Thomas Bartomeli against the Debtor related to a determination of the value of Thomas Bartomeli's interest in the Company at the time he withdrew from it. (*See* Transcript at 21–22 (testimony of Mr. McCarthy).) The Debtor appealed the Judgment and that appeal (the "Appeal") was pending as of the Petition Date. (*See id.* at 22.) By order dated October 10, 2000 (Chapter 7 Doc. I.D. No. 9), the Trustee obtained court authorization of her retention of special counsel to prosecute the Appeal. However, as noted above, the Trustee filed a "no distribu-

tion" notice on April 8, 2002. From that fact the court infers that the Appeal was unsuccessful.

20. "Financial accounts and instruments" is defined in the Original Schedules to include

checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds cooperatives, associations, brokerage houses and other financial institutions.

(Plaintiff's Exhibit H (Statement of Financial Affairs, item 11 ("Item 11")).)

have been opened postpetition. People's Savings account # 07250961455, absent from the Original Schedules (but present in the 1999 Statement), is now shown on the 2000 Statement as the account of Susan Bartomeli with a balance of $4,800 (as opposed to the $3,500 stated in the 1999 Statement). The Aetna Insurance and Northwest Mutual policies (absent from the Original Schedules but present in the 1999 Statement) are present in the 2000 Statement. The 2000 Statement lists a "book value" for the Stock of $272,930 (as opposed to the "book value" of $267,520 listed in the 1999 Statement and the "unknown" "market value" listed in the Original Schedules). The 2000 Statement lists three of the motor vehicles that were listed in the 1999 Statement (none of which were listed on the Original Schedules): the 1988 Jeep; the 1989 Lincoln Town Car and the 1990 Ford Bronco. The 1994 Honda Prelude (listed on the Original Schedules) does not appear on the 2000 Statement. The jewelry and the gun collection (present in the 1999 Statement but absent from the Original Schedules) reappear on the 2000 Statement. The only credit debt which appears on the 2000 Statement is a $4,000 "Discover Card" debt.

### D. *The Amended Schedules*

The Amended Schedules added the following debts to the Debtor's Schedule F—Creditors Holding Unsecured Nonpriority Claims:

| Claim | Amount |
|---|---|
| The Indemnity Debt | $500,000.00 |
| A guaranty to Fleet Bank for a "business Revolving Line of Credit to . . . [the Company] October 24, 2001 secured by accounts receivable" | $100,000.00 |
| A guaranty to Fleet Bank "on Promissory Note of . . . [the Company] dated March 30, 1998 secured by construction equipment" | $365,000.00 |

| | |
|---|---|
| "Credit Line [from Chase Small Business Financial Services] to . . . [the Company] Acct # 71095300206862 [presumably a guaranty]" | $103,074.90 |
| The "Discover" credit card debt | $ 8,315.37 |

## V. ANALYSIS

### A. *Bankruptcy Code § 523(a)(3)(B)*

The court finds that the Surety was neither listed nor scheduled as a creditor in this case in time to file a timely Fraud Objection. The court also finds that the Surety did not have notice or actual knowledge of this case in time to file a timely Fraud Objection. Thus, two of the requirements of Section 523(a)(3)(B) have been satisfied. What remains is to determine whether the Surety has satisfied the last element of Section 523(a)(3)(B).

██ As discussed above, Section 523(a) provides in relevant part as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

. . . . .

(3) Neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

. . . . .

(B) if such debt is of a kind specified in paragraph 2 . . . of this subsection, . . . timely request for a determination of dischargeability of such debt under . . . such paragraph[ ] [i.e., a Fraud Objection], unless such creditor had notice or actual knowledge of the case in time for such timely . . . request . . . .

11 U.S.C.A. § 523(a)(3) (West 2003). Courts are in disagreement whether, to prevail on a Section 523(a)(3) claim, an unscheduled creditor must prove that it would have prevailed (if given the opportunity) on a timely-filed Fraud Objection (or

Section 523(a)(4) or (6) complaint), or whether some lesser standard applies. *See* 3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice* § 47.20 (2d ed.2003) (discussing split of authority). The Surety urges the court to accept the view stated in cases such as *Haga v. National Union Fire Ins. Co. of Pittsburgh, P.A. (In re Haga)*, 131 B.R. 320, 326–27 (Bankr.W.D.Tex.1991), that "only a showing that a colorable or viable [Section 523(a)(2), (4) or (6) ] claim ... exists is ... required." *In re Haga* at 327. For the reasons discussed below the court rejects the *Haga* view and adopts (as the better reasoned view) the view of those courts which have held that, even in a Section 523(a)(3)(B) context, the creditor must prove the usual elements of nondischargeability under the Fraud Objection or Section 523(a)(4) or (6) (as the case may be). ■■■ The time and place where a Fraud Objection may be asserted is strictly regulated by the Bankruptcy Code and the Bankruptcy Rules. As to the time for filing, the combined effect of Bankruptcy Code § 523(c)[21] and Rule 4007(c) of the Federal Rules of Bankruptcy Procedure[22] is that Fraud Objections must be asserted prior to the expiration of the period provided for in Rule 4007(c).

> The cumulative effect of Section 523(c) and Rule 4007(c) is to confer ... [a] substantial benefit upon the debtor: "peace of mind" that if complaints asserting ... [a Fraud Objection] have not been filed by a date certain (as extended subject to Rules 4007(c) and 9006(b)), [a Fraud Objection] ... cannot be filed at all and the respective claim[ ] will be discharged.

*In re Bachman*, 296 B.R. at 599. As to the place for filing, the combined effect of 28 U.S.C. § 1334(b)[23] and Section 523(c) is to limit the place where a Fraud Objection may be asserted to the debtor's "home court" (*i.e.*, the Bankruptcy Court). *In re Massa*, 217 B.R. 412, 419 (Bankr.W.D.N.Y. 1998), *aff'd*, 187 F.3d 292 (2d Cir.1999) ("[T]he law is clear that bankruptcy courts have exclusive jurisdiction to make a determination that a debt is nondischargeable pursuant to Section 523(a)(2) ....").

---

21. Section 523(c) provides:

> (1) Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), (6), or (15) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), (6), or (15), as the case may be, of subsection (a) of this section ....

11 U.S.C.A. § 523(c)(1) (West 2003).

22. Rule 4007(c) provides as follows:

> (c) **Time for Filing Complaint Under § 523(c) in a Chapter 7 Liquidation, Chapter 11 Reorganization, or Chapter 12 Family Farmer's Debt Adjustment Case; Notice of Time Fixed.** A complaint to determine the dischargeability of a debt under § 523(c) shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a). The court shall give all creditors no less than 30 days' notice of the time so fixed in the manner provided in Rule 2002. On motion of a party in interest, after hearing on notice, the court may for cause extend the time fixed under this subdivision. The motion shall be filed before the time has elapsed.

Fed. R. Bankr.P. 4007(c). The Rule 4007 period may not be extended once it has expired unless waiver, estoppel or equitable tolling is established. *In re Bachman*, 296 B.R. 596 (Bankr.D.Conn.2003) (Weil, J.).

23. Section 1334(b) provides as follows:

> Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C.A. § 1334(b) (West 2003).

Both of the referenced benefits are lost if the Debtor fails to schedule a relevant creditor. That is because the creditor's claim of nondischargeability then would arise not under the Fraud Objection or Section 523(a)(4) or (6) but, rather, under Section 523(a)(3). The Section 523(c) and Rule 4007(c) filing deadline does not apply to the filing of a Section 523(a)(3) complaint. *In re Bachman,* 296 B.R. at 599–600. Moreover, Section 523(c) exclusive jurisdiction does not apply to a Section 523(a)(3) complaint. That means that a Section 523(a)(3) complaint can be brought in any court of competent jurisdiction (including, but not limited to, the bankruptcy court). *In re Rollinson,* 273 B.R. 352, 353 n. 4. (Bankr.D.Conn.2002) (Dabrowski, J.) ("The state courts have concurrent jurisdiction ... to determine ... proceedings under Section 523(a)(3)."); *In re Massa,* 217 B.R. at 420 ("A debtor who fails to list a creditor who holds a debt of a kind specified in Section 523(a)(3)(B) loses the jurisdictional protections of Section 523(c)."). Overstating the matter only slightly, a Section 523(a)(3)(B) complaint as to nondischargeability of a debt can be brought any time, any place. "In short, the penalty to the debtor for failing to schedule a fraud debt or otherwise inform the creditor of the bankruptcy is forfeiture of the right to enjoy exclusive federal jurisdiction and loss of the sixty-day limitations period applicable in the exclusive jurisdiction actions." *Fidelity Nat'l Title Ins. Co. v. Franklin (In re Franklin),* 179 B.R. 913, 924 (Bankr.E.D.Cal.1995).

The Surety argues that there is a third "penalty" imposed upon a debtor who fails to schedule a relevant creditor: that the creditor does not have to prove that it would have prevailed on a timely-filed Fraud Objection or Section 523(a)(4) or (6) complaint, but need prove only some lesser standard. The court finds that argument unpersuasive. Given that Congress provided explicitly for the "penalties" of loss of the limitations period and loss of exclusive federal jurisdiction, it is illogical to assume that Congress would have provided for a third "penalty" *sub silentio,* particularly a "penalty" which affected substantive law. *Accord Jones v. Warren Construction (In re Jones),* 296 B.R. 447, 449–50 (Bankr.M.D.Tenn.2003) (complete statutory analysis). *See also Eldridge v. Waugh,* 198 B.R. 545, 548 (E.D.Ark.1995), *aff'd,* 95 F.3d 706 (8th Cir.1996) (Burden was on creditor seeking to except unscheduled debt to demonstrate, *inter alia,* that their debt would have been nondischargeable under Section 523(a)(6).); *In re Walker,* 195 B.R. 187, 204–05 (Bankr.D.N.H. 1996) ("[T]he creditor must prove ... the usual elements of nondischargeability under ... [Section 523(a)(2), (4) or (6)]."); *In re Franklin,* 179 B.R. at 924 (substantive law unchanged).

*Haga* takes the view that the exclusive federal jurisdiction provision of Section 523(c) prevents a full adjudication of the merits of the Section 523(a)(2), (4) or (6) element of a Section 523(a)(3)(B) case in a concurrent jurisdiction context. *See Haga,* 131 B.R. at 327. Thus, *Haga* reasons, Section 523(a)(3)(B) must provide for less than a full adjudication of a Fraud Objection. However, *Haga* ignores that "a creditor holding a debt subject to a ... [Section 523(a)(2), (4) or (6) nondischargeability claim], and whose debt was not listed in the debtor's original schedule, has its debt transformed into a debt subject to dischargeability analysis under ... [Section] 523(a)(3)(B).". *In re Walker,* 195 B.R. at 204–05. Congress alluded to that "transform[ation]" by its use of the phrase "of a kind specified in" in Section 523(a)(3)(B). *Accord In re Franklin,* 179

B.R. at 924.[24] As noted above, the exclusive jurisdiction provision of Section 523(c) does not apply to Section 523(a)(3)(B). Accordingly, it is improper to import that jurisdictional provision into Section 523(a)(3)(B) to alter substantive law.

For the reasons discussed, the court concludes that the Surety is required to prove here that it would have prevailed on a timely-filed Fraud Objection.

### B. *Claim of a Kind Specified in Bankruptcy Code § 523(a)(2)(B): the Fraud Objection*

#### 1. *Legal Standards*

In order to prevail under Section 523(a)(2)(B), a creditor must prove by a preponderance of the evidence that a "statement in writing" (1) is materially false; (2) pertains to the debtor's financial condition; (3) is reasonably relied upon by the creditor to extend credit to the debtor; and (4) is made by the debtor with intent to deceive. *National Union Fire Ins. Co. of Pittsburgh, P.A. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir. 1996). "[O]nce a creditor establishes a *prima facie* case of fraud, the burden of coming forward with some proof or explanation of the alleged fraud shifts to the debtor." *Bethpage Federal Credit Union v. Furio (In re Furio)*, 77 F.3d 622, 624 (2d Cir.1996).

As noted by the court in *Burbank v. Capelli (In re Capelli)*, 261 B.R. 81, 90 (Bankr.D.Conn.2001) (Dabrowski, J.):

A statement is materially false if it "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *In re Furio, supra,* 77 F.3d at 625 (citations and internal quotation marks omitted). Further, "writings containing pertinent omissions may qualify as 'materially false' for purposes of a section 523(a)(2)(B) violation." *European American Bank v. Launzel–Pennes (In re Launzel–Pennes),* 191 B.R. 6, 11 (Bankr.E.D.N.Y.1996).

. . . . .

"Once it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith.... Reasonableness is therefore a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith." *In re Bonnanzio, supra,* 91 F.3d at 305 (citations and internal quotation marks omitted). *See also ... [Insurance Co. of North Amer-*

---

**24.** The *Haga* argument that the phrase "of a kind" means that Congress did not intend the substantive elements of Sections 523(a)(2), (4) and (6) to apply in a Section 523(a)(3)(B) context is refuted persuasively in *In re Jones:*

Congress used the phrase "of a kind" in at least 35 other places in the Bankruptcy Code. Viewed in the context of its broader statutory usage, "of a kind" captures the elements or characteristics specified in another section of the Bankruptcy Code and makes the incorporated provision a condition for satisfaction of the section making the reference. For example, 11 U.S.C. § 726(b) provides for payment on claims

"of a kind specified" in paragraphs (1) through (8) of 11 U.S.C. § 507(a). In *Stuart v. Carter (In re Larsen),* 59 F.3d 783, 787 (8th Cir.1995), the Eighth Circuit reached the reasonable conclusion that the phrase "of the kind specified in section 507(a)(1)" in § 726(b) limits the first priority of distribution to claims that first "qualify as administrative expense claims" under the referenced subparagraphs of § 507(a). This straight forward interpretation of "of the kind" makes sense elsewhere in the Bankruptcy Code.

*In re Jones,* 296 B.R. at 449 (footnotes omitted).

*ica v. Cohn (In re Cohn),* 54 F.3d 1108, 1117 (3d Cir.1995) ] (A creditor's reasonableness should be judged objectively, i.e., expecting "that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances.") "It is sufficient that the creditor's reliance on the [d]ebtor's representations was a contributing factor in causing the loss even though such reliance was partial and not solely motivated by the [d]ebtor's false representations." *Barristers Abstract Corp. v. Caulfield (In re Caulfield),* 192 B.R. 808, 821 (Bankr. E.D.N.Y.1996) (citation omitted). *See also In re Launzel–Pennes, supra,* 191 B.R. at 14 ("[E]ven partial reliance by a creditor on a false financial statement may be sufficient for a section 523(a)(2)(B) violation.").

> Intent to deceive is rarely established by direct evidence. *See In re Cohn, supra,* 54 F.3d at 1118; *In re Caulfield, supra,* 192 B.R. at 821. Such intent may be inferred from the totality of the circumstances of the case, *see In re Bonnanzio, supra,* 91 F.3d at 301, or may be inferred "[w]here ... a person knowingly or recklessly makes a false representation which the person knows or should know, will induce another to make a loan." *In re Furio, supra,* 77 F.3d at 625 (citation and internal quotation marks omitted). *See also ... [Hudson Valley Water Resources, Inc. v. Boice (In re Boice),* 149 B.R. 40, 48 (Bankr. S.D.N.Y.1992) ] (reckless indifference or disregard for the accuracy of a financial statement amounts to an intent to deceive).

*In re Capelli,* 261 B.R. at 90–91.

### 2. *Application of Law to Fact*

Each item in the 1999 Statement about which the Surety complains is discussed below.

### a. *The Judgment Lien*

▪ The Judgment Lien did not appear in the 1999 Statement. However, in response to the court's questioning, Mr. Hash freely admitted at the trial that the Debtor had advised the Surety of the Judgment before the Surety issued the Woodland Construction Bonds. (*See* Transcript at 30 (testimony of Mr. Hash).) The Surety argues in the Post–Trial Memorandum that, although the Debtor told the Surety about the Judgment and the Appeal, the Debtor should have but did not disclose to the Surety the existence of the Judgment Lien. (*See* Post–Trial Memorandum at 29 n. 2.) The Surety admits that it knew about the Judgment (and the Appeal) before it issued the Woodland Construction Bonds. An appeal of a judgment does not stay recordation of a judgment lien in respect of that judgment. *See Longobardi v. Blakeslee Prestress, Inc.,* No. 330301, 1992 WL 96833 (Conn.Super.Ct.1992). *See also Mac's Car City, Inc. v. DiLoreto,* 238 Conn. 172, 180, 679 A.2d 340 (1996) ("[A] judgment lien will relate back to a prejudgment attachment only if the judgment lien is filed within four months of the judgment of the trial court, regardless of the possible pendency of an appeal."). Therefore, because the Surety knew about the Judgment, the Surety also had reason to know that the Judgment Lien could not be far behind. Based upon these facts, the court is not persuaded that the Debtor's failure to disclose the Judgment Lien in the 1999 Statement was intentionally deceptive within the purview of Section 523(a)(2)(B)(iv), or that the Surety "reasonably relied" upon the nonexistence of the Judgment Lien in issuing the Woodland Construction Bonds within the purview of Section

523(a)(2)(B)(iii).[25]

The Debtor may have painted an overly optimistic picture of his chances of prevailing on the Appeal, but that communication with the Surety was oral and, in any event, insufficient proof has been offered that such communication by the Debtor was intentionally fraudulent. *Cf.* Restatement (Second) of Torts § 539 (1977) ("Representation of Opinion Implying Justifying Facts").

### b. *The Real Property*

The Surety Complains that the 1999 Statement presented the Real Property as solely owned by the Debtor while the Original Schedules showed only a one-half interest. As discussed above, the 1999 Statement and the Original Schedules are consistent in their respective treatments of the Real Property as being jointly owned by the Debtor and his wife. Accordingly, the court is not persuaded that the 1999 Statement was false in that regard.

### c. *Stock Value*

■ The Surety claims that the 1999 Statement was materially false because the Debtor placed a value on the Stock therein when he was unable to do so in the Original Schedules. However, the 1999 Statement gives a "book value" for the Stock. The Original Schedules required the Debtor to give the "market value" of the Stock. "Book value" and "market value" are two different concepts. *See Ketler v. Commissioner of Internal Revenue,* 196 F.2d 822, 827 (7th Cir.1952) ("Book value frequently bears no relationship to actual cash value or fair market value [of stock]." (citation

and internal quotation marks omitted)). Therefore, that the Debtor failed to give the "market value" of the Stock in the Original Schedules does not mean that the "book value" stated in the 1999 Statement was false. The Surety has offered no other proof that the "book value" of the Stock was misrepresented in the 1999 Statement. Accordingly, the court is not persuaded that the Debtor misstated the "book value" of the Stock in the 1999 Statement.

### d. *People's Savings Account # 07250961455*

The Original Schedules fail to list account # 07250961455 (listed in the 1999 Statement) but state that no bank accounts were closed during the year prior to bankruptcy (*see* Item 11.). Accordingly, the court finds that the 1999 Statement falsely listed that account (in the amount of $3,500) as an asset.

### e. *Vehicles*

The Original Schedules list no motor vehicles or four-wheel recreational vehicles (other than the 1994 Honda Prelude). The Original Schedules also deny that the Debtor disposed of any property (including vehicles) during the year prior to the Petition Date. (*See* Item 10.) The 1999 Statement lists a joint interest in five motor vehicles and the recreational vehicle. Accordingly, the court finds that the 1999 Statement falsely listed $13,000 ($26,000 ÷ 2) in such assets.

### f. *Jewelry and Gun Collection*

The 1999 Statement listed the above-referenced assets with an aggregate value

---

**25.** The Surety has not complained about the guaranteed debt (the "Guaranteed Debt") listed on the Amended Schedules that was not listed in the 1999 Statement. The court concludes that the Surety's silence in that regard is a result of Mr. McCarthy's admission in response to the court's questioning at the trial that the Surety understood that the Debtor had guaranteed the Company's debts. (*See* Transcript at 24 (testimony of Mr. McCarthy).)

for the Debtor's interest therein of $14,-0000 ($28,000 ÷ 2). The Original Schedules list no jewelry and only "2 pistols" valued at $1,000. The Original Schedules also deny that the Debtor disposed of any property (including jewelry or guns) during the year prior to the Petition Date. (*See* Item 10.) Accordingly, the court finds that the 1999 Statement's claim of an interest of the Debtor in the "jewelry" was false to the extent of $7,000, and its claim of an interest of the Debtor in a "gun collection" was false to the extent of $6,000 ($7,000 -$1,000).

### g. *Insurance*

The Aetna Insurance policy and the Northwest Mutual policies appear in the 1999 Statement but do not appear on the Original Schedules. If those were the only facts, the court might find that those policies are not so clearly within the scope of either Item 10 or Item 11 as to bar the inference that the Debtor "cashed out" those policies during the period after he delivered the 1999 Statement to the Surety but before the Petition Date. However, the missing policies reappear on the 2000 Statement. From the foregoing facts taken together the court infers that the Debtor recklessly listed the subject policies in both the 1999 Statement and the 2000 Statement. Accordingly, the court finds that the Debtor overstated his assets in the 1999 Statement in that regard by $4,750 ((3,600 + $5,900) ÷ 2).

### h. *Credit Card Debt*

The Debtor listed only $7,800 in credit card debt in the 1999 Statement. On the Original Schedules, the Debtor listed an additional $1,971 in "joint" credit card debt and an additional $9,019 in credit card debt listed as his sole obligation. As noted above, the period from the delivery of the 1999 Statement to the Petition Date could have been as long as seven months. The court notes that consumer credit is readily available and credit card balances can be extremely volatile, especially as a debtor slides towards bankruptcy and seven months is a long time in that context. Based upon all of the foregoing and because the Surety relied exclusively upon the Original Schedules for proof of falsity, the court is not persuaded that the Debtor misrepresented the extent of his credit card debt (as of September 30, 1999) in the 1999 Statement.

### i. *Conclusion*

 Excluding the Judgment Lien and the Guaranteed Debt (both of which have been disposed above), the 1999 Statement overstated the Debtor's assets by $34,250 and did not misstate his liabilities. The 1999 Statement lists the aggregate value of the Debtor's interest (exclusive of his wife's interest) in the listed assets at $ 472,861.[26] That means that the 1999

---

**26.** That number represents total assets listed in the 1999 Statement less Mrs. Bartomeli's interest in those assets as follows:

Value of Mrs. Bartomeli's interests in assets

| | | |
|---|---|---|
| $ | 4,000 | (bank accounts) |
| $ | 5,545 | (life insurance) |
| $ | 130,000 | (Real Property) |
| $ | 13,000 | (vehicles) |
| $ | 14,000 | (jewelry and gun collection) |
| $ | 166,545 | TOTAL |

Value of Debtor's interests in assets

Statement overstated the Debtor's assets by less than eight (8%) percent. That is not a "material[ ] fals[ity]" within the purview of Section 523(a)(2)(B)(i). Accordingly, the court concludes that the Surety could not have prevailed on a timely-filed Fraud Objection, and cannot prevail here.[27]

## VI. CONCLUSION

For the reasons discussed above, judgment will enter in favor of the Debtor and the Indemnity Debt is discharged.

| | $ 639,406 | (total assets (*See* 1999 Statement)) |
| less | $ 166,545 | (Mrs. Bartomeli's interests) |
| | $ 472,861 | TOTAL |

27. Alternatively, even if the court were to accept the Surety's argument that it need only show a "colorable" claim of a Fraud Exception to prevail here, the result would be the same. Based upon the weakness of the Surety's Fraud Objection case discussed above, the court concludes that the Surety has not shown a "colorable" claim of a Fraud Exception. *Cf. In re Haga,* 131 B.R. at 327 (creditor failed to show that it had a "colorable or viable" claim of nondischargeability).